105 F.3d 660
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Antonio ARAUJO, Defendant-Appellant.
 No. 96-1657.
 United States Court of Appeals, Seventh Circuit.
 Argued Nov. 14, 1996.
Decided Dec. 10, 1996.
 
 Before COFFEY, EASTERBROOK and MANION, Circuit Judges.
 
 ORDER
 
 1
 After a jury trial, Antonio Araujo was convicted of knowingly attempting to possess with the intent to distribute four kilograms of cocaine in violation of 21 U.S.C. § 846. That conviction was reversed and remanded for a new trial based on jury irregularities. United States v. Araujo, 62 F.3d 930 (7th Cir.1995). After attempts to reach a plea agreement failed, Araujo entered a "blind plea" of guilty. At sentencing, the district court judge refused Araujo's request for a two-point reduction under U.S.S.G. § 5C1.2, the safety valve provision. Araujo appealed.
 
 BACKGROUND
 
 2
 On June 7, 1993, Antonio Araujo was arrested after he attempted to purchase four kilograms of cocaine from Randall Kucaba, an undercover law enforcement officer. Immediately after his arrest, Araujo agreed to cooperate with police in the arrest of the man for whom he was purchasing the cocaine, C-Man (later identified as Calvin Craig). Araujo paged C-Man, as though the contemplated transaction was successfully completed, and arranged for a meeting at which Araujo would give C-Man the cocaine. At this meeting the police arrested C-Man.
 
 
 3
 At trial, Araujo did not dispute his role in the offense, nor did he dispute the government's case; instead he put on a coercion defense and testified as follows. In March of 1993, Araujo's brother, Rolly, told Araujo that King Shorty, a gang leader at Stateville Correctional Center where Rolly was incarcerated, was coercing him into arranging for a drug connection outside the prison. Araujo asked his father, Rolando, for help. Rolando, who was incarcerated at Dixon Correctional Center, gave him the pager number of another inmate's brother--in actuality Kucaba--a purported cocaine dealer.
 
 
 4
 Araujo testified that he acted as a middleman in negotiations between Kucaba and C-Man, King Shorty's nephew who was going to provide the money for the purchase and take over the connection once it had been established. Over the course of these negotiations Araujo, told Kucaba that he had participated in drug deals in the past and that he was able to procure both marijuana and heroin. Araujo testified at trial that these statements were false, and that he was merely trying to convince Kucaba that he was not a novice.
 
 
 5
 Araujo testified that C-Man and Kucaba finally agreed on a price. However, Araujo testifed that he lied to C-Man about what the price was so that he--Araujo--could earn a profit from the transaction. Araujo then testified about the plan made for the transaction.
 
 
 6
 During cross examination, the government attempted to impeach Araujo's testimony that the reason he participated in the deal was because he was fearful for Rolly's safety. Primarily, the prosecutor questioned Araujo about delays in consummating the drug transaction and about the profit he hoped to earn. He later argued that both were inconsistent with assuring Rolly's safety. The prosecutor also questioned Araujo about the statements he made to Kucaba about other drug deals, and how Araujo knew so much information about drug transactions.
 
 
 7
 At the sentencing hearing, Araujo argued that he merited a two-point reduction under U.S.S.G. §§ 2D1.1 & 5C1.2[1] based on his cooperation with the police after his arrest and his truthful and complete disclosure of all the information he knew regarding his offense via his trial testimony. The government opposed this request. Although the government agreed that Araujo met the first four § 5C1.2 criteria, it argued that he did not meet the final requirement because he failed to provide the government with all the information he knew about the offense. The district court denied the reduction based on Araujo's failure to engage in a good faith effort to fully disclose all the information he knew about his offense to the government.
 
 DISCUSSION
 
 8
 Before reaching the merits of this case, we must address the issue of our jurisdiction over this appeal. The government notes that appellate courts generally do not have jurisdiction to review discretionary decisions not to depart under the Sentencing Guidelines. But this case does not involve a district court's exercise of discretion. Sections 2D1.1(b)(4) and 5C1.2 provide that when the criteria listed in § 5C1.2 are found the sentencing judge must decrease the offense level by two points. Further, § 5C1.2 is not a departure provision, rather it regulates adjustments made within the framework of the guidelines. Cf. United States v. Blackwell, 49 F.3d 1232, 1241-42 (7th Cir.1995) (contrasting 'reduction' and 'departure' for purpose of resolving jurisdictional issue); cf. also United States v. Yahne, 64 F.3d 1091, 1095 (7th Cir.1995) (describing reduction as adjustment within structure of guidelines). In other words, a judge who reduces a defendant's offense level pursuant to § 5C1.2 is not granting a departure from the guidelines, but working within the guideline structure to achieve the appropriate sentencing range.
 
 
 9
 This court reviews a district court's interpretation of the sentencing guidelines de novo. United States v. Ramirez, 94 F.3d 1095, 1099 (7th Cir.1996). However, "[t]he district court, with its fact-finding and credibility-weighing skills, is well suited to make decisions concerning the defendant's full and honest disclosure." Id. at 1102. Thus, "we review a sentencing court's decision concerning a defendant's eligibility for a sentencing reduction under § 5C1.2 for clear error." Id. at 1099-1100. The clearly erroneous standard dictates that we "not reverse the district court unless after reviewing the entire record we are 'left with a definite and firm conviction that a mistake has been made.' " United States v. Price, 54 F.3d 342, 346 (7th Cir.1995) (quoting Anderson v. Bessemer, 470 U.S. 564, 573 (1985)).
 
 
 10
 In order to qualify for relief under § 5C1.2(5), a defendant must, by the time of the sentencing hearing, have "truthfully provided to the government all information and evidence the defendant has concerning the offense." As we have repeatedly held, § 5C1.2(5) requires more than merely admitting the relevant conduct of the offense charged. See, e.g., United States v. Arrington, 73 F.3d 144, 149 (7th Cir.1996) (Section 5C1.2(5) "states that a defendant must disclose 'all information' concerning the course of conduct--not simply the facts that form the basis for the criminal charge.").[2] Rather, § 5C1.2(5) obligates defendants to communicate to the government all the information they have regarding an offense. See Ramirez, 94 F.3d at 1102 (" 'Full disclosure is the price that Congress has attached to relief under [§ 5C1.2].' ") (quoting United States v. Montanez, 82 F.3d 520, 523 (1st Cir.1996). While " '[n]othing in the statute or its legislative history 'specifies the form or place or manner of the disclosure ... truthful full disclosure there must be.' " Id. at 1100 (internal citation omitted). Thus, we have spoken of a defendant's obligation under § 5C1.2 as one of "true cooperation" and of making "a good faith attempt to cooperate" with the government. E.g., id. (a defendant "must prove that he truly cooperated with the authorities prior to sentencing.") (emphasis added); Arrington, 73 F.3d at 148 (Section 5C1.2 "was intended to benefit only those defendants who truly cooperate.") (emphasis added); see also Montanez, 82 F.3d at 522 ("Congress was aiming its leniency at low level defendants who did their best to cooperate ") (emphasis added).
 
 
 11
 Once a defendant has raised the issue of a safety valve reduction, the government may challenge the appropriateness of a reduction by pointing to information not disclosed or not disclosed truthfully. See Ramirez, 94 F.3d at 1102 ("The government may respond to the defendant's statements by challenging them for their lack of candor or completeness or by calling the court's attention to the omission of evidence that the defendant should know and has not turned over to the government."). The burden is at all times on the defendant to prove that he is entitled to the sentence reduction. Id. at 1101.
 
 
 12
 The government argues that Araujo's testimony was both incomplete and untruthful, and therefore, the district court was correct in denying the two-point reduction. In support of these allegations, the government points to several pieces of information logically within Araujo's knowledge, but which he never disclosed or discussed with the government.[3] For instance, the government wanted to know how Araujo was put in touch with C-Man, whether he conducted any transactions with C-Man prior to the June 7, 1993 drug deal, the substance of the conversations he had with his father about the drug deal, and how he arranged for the money used in the drug deal. The government also argues that Araujo testified falsely by claiming that he was coerced into the drug transaction, that this was the first drug deal he had ever participated in, and that he brought $82,000 to the drug deal when police only recovered $75,690. The government concludes that Araujo did not engage in the good faith effort to fully disclose as is required by § 5C1.2.
 
 
 13
 Araujo first argues that, in fact, "each and everyone [sic] of [the government's] questions were addressed either on direct examination of the defendant or on cross examination by [the government]," (Araujo Br. at 17), and therefore the district court clearly erred in finding his disclosure incomplete. However, Araujo has failed to cite any specific portions of the trial transcript to support this statement. Our independent review of the record shows that while some of the government's questions were "addressed,"[4] the sentencing judge could reasonably have concluded that the testimony was only cursory and certainly not complete in the sense required by § 5C1.2. Further, we find no indication in the record that Araujo testified about how he was put in touch with C-Man[5] or whether he conducted any transactions with C-Man prior to June 7, 1993.[6] Thus, the sentencing judge's conclusion that Araujo's disclosure was incomplete is not in clear error.
 
 
 14
 Araujo then, with a novel argument, claims that the sentencing judge actually did find him to be truthful as evinced by his refusal to enhance his sentence for obstruction of justice through perjury. However, this argument is misleading. It is one thing to know someone is perjuring himself in testimony and another to enhance his sentence for perjury or false swearing. The sentencing judge may feel that the sentence he is about to impose is adequate, and that enhancing it for perjury would merely be piling it on. The record here supports just such a supposition, as the district court judge sentenced Araujo to the absolute minimum number of months within the guideline range.
 
 
 15
 Further, perjury involves testifying falsely about a material matter. See United States v. Hickok, 77 F.3d 992, 1006-07 (7th Cir.), cert. denied, 116 S.Ct. 1701 (1996). Whether this was the first drug deal Araujo ever participated in was not material to the government's case against him, nor was the question of how much money was recovered upon his arrest. Thus, Araujo could have lied about both these issues without the judge penalizing him for perjury. Moreover, given the government's cross examination, the sentencing judge could have reasonably concluded that Araujo was lying about his prior history of drug dealing and about whether his participation in the instant offense was really motivated by fear for his brother's safety.
 
 
 16
 Araujo asserts that in denying him the safety valve reduction the district court "read out" the final provision of § 5C1.2: "the fact ... that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement." However, this part of the § 5C1.2(5) merely enforces the main purpose of the statute by requiring courts to grant the reduction to low level drug offenders who do not have enough information to qualify for the substantial assistance reduction, but who nonetheless fully cooperate by providing all the information that they do know. See Arrington, 73 F.3d at 148, 148 n. 5. This provision does nothing to alter the requirement that defendants provide the government with all of their information. The district court found that Araujo did not provide the government with all the information he had concerning his offense, thus this issue is not even reached.
 
 
 17
 Finally, Araujo states that he should not be held accountable for the government's failure to request a proffer. We disposed of this argument in Ramirez: "The government does not bear a burden of seeking information from the defendant. Rather, the burden is on the defendant to come forward." Ramirez, 94 F.3d at 1101.
 
 
 18
 Because the district court's conclusion that Araujo did not meet the § 5C1.2 criteria is supported by the record, it is not clearly erroneous. Therefore, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 Section 2D1.1 provides for a two-point reduction in offense level if the offense level is 26 or above and the requirements of 5C1.2 are met; section 5C1.2 is the safety valve provision and applies when the defendant meets the following criteria:
 (1) The defendant does not have more than 1 criminal history point ...
 (2) The defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon ... in connection with the offense;
 (3) The offense did not result in death or serious bodily injury to any person;
 (4) The defendant was not an organizer, leader, manager, or supervisor ...
 (5) Not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.
 U.S.S.G. § 5C1.2
 
 
 [2]
 The issue before this court in Arrington was whether the defendant warranted relief from a statutory mandatory minimum sentence under 18 U.S.C. § 3553(f). And, in fact, several of the cases we cite today involve the interpretation and application of § 3553(f)
 However, U.S.S.G. § 5C1.2 and 18 U.S.C. § 3553(f) are identical in the criteria for relief. They differ only in the relief that they provide: Section 5C1.2, in conjunction with § 2D1.1(b)(4), provides for a two point reduction in offense level; while § 3553(f) allows a judge to sentence without regard for a statutory mandatory minimum.
 
 
 [3]
 At oral argument, the government argued for a bright-line rule that would preclude mere trial testimony from ever meeting the safety valve criteria because much of the information the government would normally inquire about at a proffer interview would necessarily be excluded from questioning during cross examination under Federal Rules of Evidence 402, 404(b), 611(b), or others. However, we need not address the issue of whether, in the unlikely event that a defendant's attorney fails to object and a defendant actually does manage to fully and truthfully disclose all the information he has during cross examination, that defendant is entitled to a § 5C1.2 reduction, because that case is not before us today
 
 
 [4]
 For example, Araujo testified about conversations with his father, (Trial Tr. at 506-508; 528-30; 626-29), and about arranging for the money used in the drug deal. (Trial Tr. at 532-34; 553-58.)
 
 
 [5]
 Araujo testified about how he was put in touch with Kucaba, (Trial Tr. at 507-508), but, while Araujo talked about C-Man throughout his testimony, he never disclosed how he was originally put in touch with C-Man for the instant deal
 
 
 [6]
 Again, while Araujo testified about how long he knew C-Man, (Trial Tr. at 501-502), he did not discuss whether he had conducted any prior transactions with C-Man