NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0437n.06

No. 24-5038

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Oct 30, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|     Plaintiff-Appellee | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE |
|     v. | ) ) | |
| PAUL SEIB, | ) ) | |
|     Defendant-Appellant. | ) ) ) | OPINION |

Before: CLAY, WHITE, and DAVIS, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Defendant-Appellant Paul Seib appeals his 120-month sentence for conspiracy to possess with intent to distribute five kilograms or more of cocaine, challenging the district court's failure to apply the safety-valve provision of 18 U.S.C. § 3553(f) and U.S.S.G. § 2D1.1's drug-quantity provision. We AFFIRM.

**I.**

In October 2021, Luis Garcia, a Homeland Security special agent, began working on an investigation of Paul Seib after an informant notified the agency that Seib was looking to purchase narcotics. Between November 1 and November 9, 2021, Garcia, posing as a cocaine dealer named "Primo," spoke with Seib on the phone several times. During one of those conversations, Seib told Garcia that he wished to purchase cocaine and have it delivered in Memphis, Tennessee. He also said he was looking to establish a long-term business relationship with "Primo." During a phone call on November 4, 2021, Seib agreed to purchase ten kilograms of cocaine for $28,000

per kilogram and to fly to Memphis to accept delivery of the cocaine. He stated that another person would accompany him and that person would have the money to pay for the cocaine.

On November 9, 2021, Seib arrived at the La Quinta Inn & Suites in Memphis. In a hotel room at the La Quinta, Seib discussed his planned purchase of ten kilograms of cocaine with two undercover agents. Seib stated that he had been "working the transaction" for more than a year and a retired Major League Baseball player, Luther Hackman, was funding the purchase. (R. 102 ¶ 12, Presentence Report, PageID 338). An undercover agent then entered the room with a duffle bag that contained ten kilograms of cocaine, individually wrapped in ten bundles. Seib inspected one of the bundles and said that the cocaine was satisfactory. Seib then left the hotel room to find out why the money had not yet arrived. When he returned, he was accompanied by Hackman. Seib told the undercover agents that he had been working with Hackman for years, that he was responsible for getting the cocaine to Hackman, and that Hackman would then give the cocaine to his "people." (R. 147, Testimony of Luis Garcia, PageID 720). Seib and Hackman explained that another person had travelled from Alabama to Memphis with the money for the cocaine, but he left shortly after he arrived because he feared being robbed. One of the undercover agents told Seib he was upset that he had not received the money. Seib apologized and said he would discuss the issue with his team. Seib and Hackman then left the hotel.

Seib was charged with conspiracy to possess with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. A jury found him guilty as charged and made a specific finding that five kilograms of cocaine or more were attributable to him "as the result of his own conduct and the conduct of other co-conspirators reasonably foreseeable to him." (R. 83, Verdict Form, PageID 166). Prior to his sentencing hearing, Seib provided a written proffer statement detailing his involvement in the November 9th meeting. The district court sentenced

Seib to 120 months in prison, the statutory mandatory minimum sentence. 21 U.S.C. § 841(b)(1)(A).

## II.

Seib first argues that the district court erred in failing to apply the safety-valve provision of 18 U.S.C. § 3553(f) to its sentencing decision. The safety-valve provision allows a court to impose a sentence "without regard to any statutory minimum sentence, if the court finds that the defendant meets the criteria in 18 U.S.C. § 3553(f)(1)–(5)." U.S.S.G. § 5C1.2(a). "Because a district court makes a factual finding when it grants or denies such a motion, we review for clear error." *United States v. Gardner*, 32 F.4th 504, 526 (6th Cir. 2022).

The five criteria of 18 U.S.C. § 3553(f) are:

(1) defendant does not have more than 4 criminal history points, excluding any criminal history points resulting from a 1-point offense, as determined under the sentencing guidelines; a prior 3-point offense, as determined under the sentencing guidelines; and a prior 2-point violent offense, as determined under the sentencing guidelines;

(2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(3) the offense did not result in death or serious bodily injury to any person;

(4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and

(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement. Information disclosed by a defendant under this

subsection may not be used to enhance the sentence of the defendant unless the information relates to a violent offense.

The fifth criterion, which is at issue in this case, "requires a defendant to admit the conduct charged" as well as to "volunteer any information aside from the conduct comprising the elements of the offense." *United States v. O'Dell*, 247 F.3d 655, 675 (6th Cir. 2001) (quoting *United States v. Arrington*, 73 F.3d 144, 149 (7th Cir. 1996)); *see also* U.S.S.G. § 5C1.2 cmt n.3 (noting that this requirement includes information about "the offense of conviction and all relevant conduct"). In his objections to the presentence report and position paper, Seib asserted that his proffer had met these requirements, stating that he "provided a truthful letter to the government of his actions and to [the district court] that could and should satisfy the fifth requirement for safety-valve consideration." (R. 31, Defendant's Second Amended Objections and Position Paper, PageID 385).

The government contended that the safety-valve reduction provision did not apply to Seib because (1) he did not admit in his proffered statement that he committed the charged offense or any associated relevant conduct; (2) a written statement, rather than a face-to-face statement, is insufficient to comply with the safety-valve provision; and (3) his statement was not truthful as required by the safety-valve provision. At Seib's sentencing hearing, the district court concluded that Seib "failed to establish . . . by a preponderance of the evidence that the written proffer is truthful." (R. 138, Transcript of Sentencing Hearing, PageID 604). Seib asserts that this finding was erroneous.

The district court did not commit clear error in concluding that Seib's written statement failed to meet the requirements of 18 U.S.C. § 3553(f)(5). There is ample evidence in the record suggesting that Seib's proffer statement was not truthful. In his statement, Seib denied conspiring

with Hackman as part of the November 9th cocaine deal. (*See* Doc. No. 109-1, Written Statement of Paul Seib, PageID 392 ("There is NO arrangement or agreement with Mr. Hackman to purchase any drugs/cocaine at any time.")). Seib also offered an explanation for Hackman arriving at the hotel on November 9th, stating that when he left the hotel after the money for the cocaine failed to arrive, he called Hackman and "told him I was in need of some help. He did not understand what my situation was, but I begged him to please come and help me." (*Id.*, PageID 398–99).

But other statements in the record indicate that Seib had, in fact, conspired with Hackman regarding the November 9th transaction. Prior to the November 9th meeting, Seib asked "Primo" about delivering cocaine in Memphis, despite Seib's never having been to Memphis. It appears that Hackman, however, had an established drug-distribution network in Memphis. An informant told Homeland Security agents that Hackman often received cocaine and methamphetamine in the Memphis area from a source in Mexico and then distributed the drugs throughout Tennessee and other states. Further, during his conversation with the undercover agents on November 9th, Seib stated that he had been "working the transaction" for more than a year and that Hackman was funding the purchase. (R. 102 ¶ 12, PageID 338). And when Seib returned to the hotel with Hackman after leaving to find out where the money was, he told Garcia that he had been working with Hackman for years, that he was responsible for getting the drugs to Hackman, and that Hackman's "people" would then take the drugs. (R. 147, Testimony of Luis Garcia, PageID 719–20). During the same conversation, Hackman said, "I normally get it fronted." (*Id.*, PageID 767.) At Seib's trial, Garcia explained that "fronting the drugs" means allowing the purchaser to take the drugs and pay for them later. (*Id.*) This evidence amply supports the district court's finding

that Seib's proffer statements regarding the absence of a conspiracy with Hackman and his explanation of Hackman's role in the November 9th transaction were not truthful.

Having made this finding, the district court had no need to address whether Seib had admitted the conspiracy as required under 18 U.S.C. § 3553(f)(5), or whether a written proffer was sufficient, because the "applicability of the safety valve turn[ed] on truthfulness." (R. 138, PageID 604). And given that we see no error in the district court's conclusion that Seib's untruthful proffer rendered him ineligible for safety-valve consideration, we also decline to address these additional arguments. *See Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 458 (6th Cir. 2020) ("Absent 'exceptional circumstances,' [the court of appeals] normally decline[s] to rule on an issue not decided below." (quoting *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 576 (6th Cir. 2013)).

**III.**

Next, Seib argues that if this Court agrees that the district court should have granted relief under the safety-valve provision, it should also find that the district court erred in not applying U.S.S.G. § 2D1.1 in calculating the applicable drug quantity, which would have resulted in a drug-quantity calculation of zero.

In his objections and position paper, Seib argued that the drug-quantity calculation should be zero under U.S.S.G. § 2D1.1 cmt n.5 because he had no money when he arrived at the November 9th meeting and therefore was not "reasonably capable of" purchasing any cocaine. The district court concluded that it could not sentence Seib below the mandatory minimum using U.S.S.G.

§ 2D1.1 because Seib had not met the requirements of the safety-valve provision. Instead, the district court sentenced Seib to 120 months in prison, the mandatory minimum sentence.

Seib does not contest that having found that he did not meet the requirements of the safety-valve provision, the district court was not permitted to sentence him below the mandatory minimum, regardless of his ability to purchase the quantity of cocaine attributed to him. Thus, he has shown no error.

## IV.

For the reasons set out above, we affirm.